# Staunton.

## FULTZ v. BRIGHTWELL, &c.

### September 27th, 1883.

1. PERSONAL REPRESENTATIVES—*Confederate currency—Case at bar.*—In 1859, suit in A. county, in names of widow and heirs of P. B., all of whom, during the war, were outside Confederate lines, and non-residents, to sell house and lot descended upon them. Sale in 1860 to R. B. confirmed. F., administrator of P. B., as commissioner, collected nearly the entire purchase money in gold, or its equivalent. Under decree of 10th June, 1863, in that suit, to which he was no party, and which involved no settlement of his accounts and indebtedness, without notice to widow and heirs, F. deposited the amount of the purchase money in Confederate currency with the general receiver of the court. In 1873, widow and heirs filed bill, treated as ancillary to original suit, and as petition to rehear decrees therein, to hold F. and the property liable for the purchase money, which bill the circuit court sustained. On appeal by F.

HELD : (*Lacy, J., dissenting.*)

    1. The deposit of the Confederate currency, with the general receiver, under the decree of June, 1863, did not discharge the administrator from liability for the payment of that purchase money.

    2. It was his duty either to have invested that money, so as to have it forthcoming when distribution could be made, or to have applied to a court of chancery, by appropriate proceedings, for its aid and direction.

    3. It was not competent for the court below, even if it so intended, to authorize the administrator to relieve himself of responsibility by a deposit of a depreciated and depreciating currency.

    4. That decree, entered without notice to those interested in the fund, and in a cause wherein the administrator was no party, was a *void* decree, and may be so treated collaterally.

    5. But the decree being interlocutory, and the bill being considered a petition for its rehearing, under the circumstances it was proper to rehear it and set it aside.

Appeal from decree of circuit court of Augusta county, entered at its June term, 1881, in the cause of *Brightwell, &c.,* v. *Brightwell's heirs.* Ptolemy Brightwell died in the state of Missouri intestate, leaving a widow and children, and real and personal estate in said county. David Fultz, in 1858, qualified in said county as his administrator. In a suit instituted in 1859, in said circuit court, in the names of the widow and heirs for the purpose, a house and lot, descended upon them from the intestate, was decreed to be sold, and in 1860 sale thereof was made and confirmed to Robert G. Bickle. The administrator, who was no party to the suit, was appointed commissioner to collect the purchase money, and did collect nearly the whole of it in gold, or its equivalent. On 10th June, 1863, in that suit, without any notice to the widow and heirs, who, during the entire war, were outside the Confederate lines and residents of the state of Missouri, a decree was entered, under which the administrator deposited, in Confederate currency, with the Central Bank at Staunton, which was the general receiver of the said circuit court, the amount so collected by him. In 1873 the widow and heirs filed their bill, which was always treated as ancillary to the original suit and as a petition to rehear and set aside decrees therein, to hold the administrator and the house and lot liable for the said purchase money, and to set aside the deed conveying said property to Bickle. The bill was demurred to, and the allegations thereof denied by the answers, and numerous depositions taken. The circuit court set aside the decree, and also the deed, and decreed against Bickle for the original purchase money, with interest and costs, and required the administrator to pay again the sums paid by him in Confederate currency to the general receiver.

From this decree, Fultz and Bickle appealed to this court. After the appeal was allowed, and before the hearing, Bickle compromised with the appellees. The case was decided on Fultz's appeal alone.

*H. W. Sheffey*, and *David Fultz*, for the appellant.

This decree appellants insist is erroneous. The demurrer to the bill should have been sustained. The defendants had no such common interests in the subjects of controversy as to justify a joint suit against them. Bickle had no interest in the settlement of the administration accounts, and the administrator had no interest in the house and lot or the purchase money. It is a case of misjoinder of parties defendent.

The independent suit cannot be maintained. In *Wilson* v. *Smith*, 22 Gratt. 493, the court decided that—

"A decree of a court of competent jurisdiction, in a suit between proper parties, is valid and conclusive until reversed on some proper proceeding in the same suit and the same court, or an appeal to an appellate court; and if there were any irregularities in the proceedings, objection on that account could only be made, if. at all, in that suit, or on appeal from the decree therein, and such an objection cannot be made in an independent suit."

The court had no authority to set aside and annul its own decrees of November, 1862, and June, 1863. After the whole objects of the suit had been finally settled, by an able and experienced judge, having complete jurisdiction of the subject, and who was cognizant of all the facts and circumstances then surrounding the case, and that settlement acquiesced in by all parties for ten years, the decree should not have been disturbed.

In *Vorhees* v. *The Bank of the United States*, 10 Peters R. 449, Justice Baldwin in delivering the opinion of the court, said: " If the principle once prevails that any proceeding of a court of competent jurisdiction can be declared to be a nullity by any court, after a writ of error or appeal is barred by limitation, then every county court and justice of the peace in the Union may exercise the same right. If after its rendition, the judgment is declared void for any matter which can be assigned

for error only, on a writ of error or appeal, then such court not only ursurps the jurisdiction of an appellate court, but collaterally nullifies what such court is prohibited by express statute law from ever reversing." See *Harvey* v. *Tyler*, 2 Wall. 328, where cases are reviewed; *Blount* v. *Darrich*, 4 W. C. C. 657; *Pennington* v. *Gibson*, 16 How. 65; *Maxwell* v. *Stuart*, 22 Wall. 77; *Grignon's crs.* v. *Astor*, 2 How. 341; *Tilton* v. *Cofield*, 3 Otto, 162; *Gunn* v. *Plant*, 4 Otto, 664.

This doctrine has been uniformly recognized by that court, and the learned judge, who delivered the opinion of the court in *Cooper* v. *Reynolds*, 10 Wall. 316, said: "This principle has been often held by this court, and by all courts, and it takes rank as an axiom of the law."

Judge Bouldin in delivering the opinion of the court in *Mead* v. *Jones*, 24 Gratt. 363, said: "No objection was ever made to any of the proceedings; and now after the loss of the fund by the disastrous termination of the war, it is sought to make the guardian responsible for an act approved by the court, and never disapproved, so far as the record discloses, by the parties or their counsel. A rule of this sort adopted by this court would produce incalculable mischief throughout the state, and tend to the utter ruin of a vast number of innocent officers, acting under the sanction and by the authority of the court during the protracted struggle in which the country was engaged. Every consideration of sound policy and justice requires, that such officers should not be held responsible for acts *bona fide* performed under the direct approval and sanction of the court appointing them." ·

But this question must be regarded as finally settled by the case of *Lancaster* v. *Wilson*, 27 Gratt. 624. The learned judge said: "No matter how irregular or how erroneous may have been the proceedings in that suit, they cannot be enquired into in this. That would be to assail collaterally the judgment of a court of record which had jurisdiction of the parties and subject matter. This can never be done.     *     *     *     A judg-

ment would no longer be a final adjudication of the rights of lit-
igants, but the starting point from which a new litigation would
spring up; acts of limitations would become useless and nu-
gatory; purchasers on the faith of judicial process would find
no protection; every right established by a judgment would be
insecure and uncertain, and a cloud would rest upon every
title."

But the force and validity of said decrees for the protection
of the officers who acted under them, are clearly established by
the third section of one hundred and thirty-eighth chapter of
the Code 1873, which provides that all judgments, decrees, &c.,
rendered by the courts during the war, and all acts of sheriffs,
commissioners, &c., in obedience to or by authority of said judg-
ments, decrees, &c., "be held to have, and to have had at all
times, the same force, virtue and effect as if no question had
been made as to the lawful authority of said state governments."
Had there been no rebellion, it would not be pretended that the
court below had authority to set aside its own decrees and sub-
ject the officers who obeyed them to a heavy responsibility.

But the decree of June, 1863, was final as to appellants.
*Fleming* v. *Bolling*, 8 Gratt. 292 ; *Rogers* v. *Strother*, 27 Gratt.
417, and Judge Christian in delivering the opinion of the court
in *Dickinson* v. *Helms*, 29 Gratt. 471, said: "I think that the
decree of October, 1863, confirming the report of the receiver,
that the whole of the purchase money for the " Houston tract "
had been lawfully paid, and directing a deed conveying the title
to the heirs of Washington Dickinson, was a final disposition
of the case so far as Dickinson's heirs and administrator were
concerned, and binding upon all parties then before the court.
It ought not to have been disturbed seven years thereafter, or
ever afterwards, but ought to have been a finality." All the
authorities on this subject are carefully reviewed by Judge Burks
in *Rawlings* v. *Rawlings*, from which it clearly appears that the
decree of June, 1863, was final as to appellants.

But the only allegation in the bill that could give the court

jurisdiction was denied and disproved. The bill should have been dismissed with costs. The appellees coming into court after the great delay, upon charges which they must have known were false, can have no claim to relief in a court of equity.

It is proved that when Confederate money was introduced, it was at par with bank notes. In fact, it was preferred by a large portion of our citizens—both were received by the banks on deposit, and in payment of all notes due at the banks, without distinction, and paid out to all depositors, and used for all banking purposes until about the close of the year 1862, when Confederate money had become almost the entire currency in use. "It was current for all the purposes of a circulating medium at that time in the common usuages of business, for the payment of all debts, and the purchase of all kinds of property at prices, but little, if any, advanced above the prices which had existed before the war." *Dickinson* v. *Helms*, 29 Gratt. 467. In transacting the business of the country these currencies were used indiscriminately; they were at par with each other, continued at the same relative value, and gradually depreciating until they both went down together. It is also proved, that after Confederate money was introduced, it was impossible to keep it separate and distinct from the bank note currency. They unavoidably became blended and were used as of equal value. Judge Hendren, in answering the sixth question, says: "I state unhesitatingly that it was not practicable to keep the former bank note currency separate and distinct from the Confederate currency in point of value." This is also clearly proved by all the other witnesses, and especially by Mr. Bledsoe and Mr. McGuffin, the bank officers, who say that there was no distinction made in taking in or paying out, until the close of 1862, when Confederate money was the only money paid out by the banks.

In every view of this case, the decree complained of is wholly without authority to sustain it, and in violation of every principle of equity as laid down in *Davis* v. *Harman, Dixon* v. *McCue*,

*Walker* v. *Page, Newton.* v. *Bushong*, *Meade* v. *Jones, Mills* v. *Mills*, and *Myers* v. *Zetelle.*. *The evidence clearly shows this case is identical in all its material facts with Dickinson* v. *Helms, and must be decided by that case.* In *Hale* v. *Wall, &c.,* 22 Gratt. 424, Judge Bouldin, in delivering the opinion of the court, said: "It would be too rigorous and unjust; would be in violation of those well settled principles, founded in reason and conscience, which control the action of courts of equity, to hold that though the appellant has been guilty of no *mala fides,* no misconduct, no negligence, yet he is to be held responsible for a loss which he had no part in creating and no power to prevent."

*Thomas D. Ranson,* for the appellees.

LEWIS, P., delivered the opinion of the court.

Whether the deposit of Confederate currency with the general receiver of the circuit court of Augusta, made by the appellant, Fultz, under the decree of June 10, 1863, discharged him from liability as the administrator of Ptolemy Brightwell, deceased, is the main question for determination on this appeal. The court below held that it did not, and, we think, correctly. That decree was entered without any notice whatever to the parties interested in the fund in question; it was entered in a suit to which the administrator was not a party, and the sole object of which was a sale of the house and lot in the town of Staunton, with a view to the distribution of the proceeds among the widow and heirs of the appellant's intestate. The suit was begun in 1859, and from the commencement to the close of the late war, the parties in interest were all, with one exception, outside of the Confederate lines, and residents of the state of Missouri. The fund for which the administrator was liable had been almost wholly collected by him before the war, in gold or its equivalent; and if, by reason of the pendency of suits against the estate and certain of the distributees, or from any other

cause, it could not be distributed, it was his plain duty to have safely invested it, to be forthcoming when distribution could be made, or, by appropriate proceedings, to have applied to a court of chancery for its aid and direction in the management of the trust. This he did not do; it does not appear that he invested the fund, or that it, at any time or anywhere, was deposited in his name as administrator.

Under these circumstances, therefore, it was not competent for the circuit court, by its decree, even if so intended, to authorize the administrator to relieve himself of liability by a deposit of a depreciated and depreciating currency. These principles, founded upon obvious reasons of natural justice, are well established by repeated decisions of this court, and need no elaboration in the present case.

In *Crickard's executor* v. *Crickard's legatees*, 25 Gratt. 410, an executor was held liable, in whose hands there was a fund, at the beginning of the war, which he could not then distribute, because the parties entitled were not competent to receive it, and which, by an order of the circuit court of Augusta, in June, 1863, in a suit, previously brought to settle the estate, he invested in Confederate bonds. He averred that he had invested the fund according to his best judgment, but that after the war began, the investments became, beyond his control, converted into Confederate money, and that afterwards, under the order of the circuit court, he invested the fund in Confederate bonds. And he insisted that by that order he was relieved of liability. But this court held otherwise. It said: "The executor does not inform the court   *   *   *   *   in what manner he invested the funds in his hands, which he declares in his answer 'were invested by him, according to his best judgment and discretion, in the management of his trust;' nor does he offer any explanation of how 'these investments become, beyond his control, converted into Confederate money.' One of two things is certainly true, and in either event the executor is equally responsible. He either retained the money in his own hands, paying interest

to the parties entitled, and regarding it as an investment in his hands for them, or he loaned it out upon securities of some sort. If he retained it, he became the debtor of the legatees; and having received gold, cannot discharge his debt in a depreciated currency. If he loaned it out, he had no right to receive it in Confederate currency, depreciated in June, 1863, to one-tenth of its face value. And if he changed the investment he had made, and suffered safe and solvent securities to become 'converted into Confederate money,' he committed a *devastavit*, for which the law will hold him responsible. This has been expressly decided by this court, not only in the case of *Campbell's executors* v. *Campbell's executor*, 22 Gratt. 649,   *   *   *   *   but in a number of cases where appeals have been refused, where the record and petition presented this precise question."

We have thus quoted at length from the opinion in that case, because what is there said applies with peculiar force to the present case. It would be strange indeed, and contrary to the plainest principles of justice, if a debtor, and especially a fiduciary, having in his hands a fund collected in good money, could by an order of court, obtained without notice to the parties interested in the fund, relieve himself of liability by a payment in a currency not a legal tender for debts, and greatly depreciated. That such orders and payments thereunder are utterly invalid for such purpose has often been decided by this court. Thus in the case of *Beery* v. *Irick*, 22 Gratt. 614, it was held that an order of the circuit court was void, which was obtained without notice, in 1862, authorizing a purchaser of land, which had been sold in 1857 under a former decree in the cause, to pay to the general receiver of the court the balance of purchase money due by him, to be invested in state bonds, and that the payment in Confederate currency under the order did not discharge the purchaser. See also *Myers* v. *Nelson*, 26 Gratt. 729; *Purdie and wife* v. *Jones*, 32 Gratt. 827.

But the appellant insists that the decree of the 10th June, 1863, cannot be assailed in a collateral or independent suit, and

that the demurrer to the bill ought to have been sustained. It is a sufficient reply to this objection to say, that if the decree is construed as appellant insists it should be construed, viz: as authorizing a deposit in Confederate currency, then, entered as it was without notice to the appellees, in a suit to which the administrator was not a party, and in which a settlement of his accounts and indebtedness was not asked for nor involved, it was a *void* decree, and may be so treated in any proceeding, collateral or otherwise. The case does not come within the act of the legislature of March 5, 1863 ; (*Campbell's executors* v. *Campbell's executor*, 22 Gratt. 684 ; *Kirby* v. *Goodykoontz*, 26 Id. 302 ; 4 Minor's Institutes, 1241 ;) and if by the deposit under that decree the liability of the administrator was discharged, it is difficult to see why any other debtor of the appellees might not, with the same propriety, have obtained a like decree in the same suit, and discharged his liability by a deposit of Confederate currency.

But the bill which was filed in 1873, was treated throughout in the court below as ancillary to the original and depending suit of *Brightwell, &c.,* v. *Brightwell's heirs,* and as a petition for the rehearing and review of the decrees complained of in that suit. This it was competent for the court to do, and the decree of June 10th, 1863, being an interlocutory decree, it was properly reheard and set aside. In *Kendrick et al.* v. *Whitney et als.,* 28 Gratt. 651, it was said that cases may be found in which the court has reheard a cause at the distance of eighteen years from the time the decree complained of was pronounced. In another case the court refused to discharge an order for a rehearing, though at a distance of twenty-five years. Whether a rehearing shall be granted is said always to depend upon the sound discretion of the court upon all the circumstances of the case. Adams' Eq., margin, page 379 ; *Land* v. *Wickham,* 1 Page, 256.

The appellant's exceptions to the master's report were properly overruled. It is insisted that interest on the fund during

the period of the war should have been abated, and that the administrator should have been credited with the face, and not the scaled value merely of the Confederate currency disbursed by him in the payment of debts. As matter of fact, the war interest was abated, except as to the resident distributee, and as the whole fund which went into his hands was collected in good money, with the exception of a few small sums, of the aggregate scaled value of about forty dollars, he was properly held accountable accordingly.

The last error assigned is that the court erred in not requiring the plaintiffs' counsel to answer the interrogatories propounded by the appellant before the master. No exception to the report on that ground was taken, nor does it appear that the matter was in any way brought to the attention of the court. And it is now too late to raise the objection here.

That this is a case of hardship upon the appellant there can be no doubt, but we have carefully considered it, and are satisfied that the decree of the circuit court is right, and must be affirmed.

LACY, J., dissented.

DECREE AFFIRMED.